Filed 11/1/22  Fields v. Acorns Advisers CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| MICHAEL LANE FIELDS, | B311766 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. 19STCV37113 |
| ACORNS ADVISERS, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David Sotelo, Judge.  Affirmed.

Greenberg Glusker Fields Claman & Machtinger and Bertram Fields for Plaintiff and Appellant.

Baker & McKenzie, Bradford K. Newman and Anne Kelts Assayag for Defendant and Respondent.

_____

While seeking a business relationship with defendant Acorns Advisers, LLC, plaintiff Michael Lane Fields shared ideas with Acorns that plaintiff claims Acorns later used. Plaintiff sued Acorns for compensation under an implied contract theory. The trial court granted Acorns's summary judgment and plaintiff appealed. Plaintiff fails to show a triable issue as to whether a contract existed. Specifically, he directs us to no evidence that he shared his ideas with any expectation of compensation, reasonable or otherwise. Moreover, the evidence shows that he shared his ideas with Acorns for the purpose of establishing a future business relationship and not with the intention of selling them. We therefore affirm.

## BACKGROUND

Acorns is a financial technology and services company focused on serving millennials. Its CEO is Noah Kerner. Plaintiff has an MBA and various financial services licenses.

At a time when plaintiff was looking for a new job, Alan Patricof, an Acorns investor and friend of plaintiff's grandparents, asked Mr. Kerner to meet with plaintiff as a favor to Mr. Patricof. Mr. Kerner obliged and arranged a lunch with plaintiff and two other Acorns executives, David Keegan and Manning Field.

The lunch took place in late 2016. At the lunch, Mr. Kerner referred to the possibility of plaintiff's employment by Acorns but did not make him any offer. After the lunch, plaintiff had an e-mail exchange with Mr. Keegan but heard nothing further from Mr. Kerner. This disappointed plaintiff.

Plaintiff repeatedly communicated to Mr. Patricof through a mutual contact that Acorns had not hired plaintiff but that plaintiff remained interested in Acorns. In mid-2018, Mr. Kerner

2

e-mailed Mr. Patricof and others that Acorns was looking to fill a business development position. Mr. Patricof again referred Mr. Kerner to plaintiff. Mr. Kerner, in turn, contacted plaintiff and suggested he apply for an open business development position at Acorns. Plaintiff applied and was invited to interview for the position. After the interview, Acorns told plaintiff that he would not be hired for the position.

Apprehensive that this would disappoint Mr. Patricof, Mr. Kerner introduced plaintiff to another Acorns employee, Jike Chong, by e-mail. Mr. Chong was responsible for a project that Acorns codenamed "Plan Project." Mr. Kerner described Plan Project as development of a product by which Acorns customers could manually allocate portions of their paychecks into their investment, checking, and retirement accounts. As part of his work on Plan Project, Mr. Chong wanted to meet with financial planners about general financial planning concepts. According to plaintiff, Mr. Kerner suggested that plaintiff "meet with Mr. Chong to discuss [plaintiff's] ideas for Acorns, and that something good might come out of that meeting."

Plaintiff testified that, by this point, "[he] had decided that, instead of full-time employment [he] would prefer a consulting arrangement with Acorns under which, for a reasonable fee, [he] would provide ideas that furthered their planning for a reasonable fee." However, he has no recollection of communicating this to Acorns.

Plaintiff met with Mr. Chong during the latter half of 2018. According to Acorns, they had two meetings and two telephone calls. Plaintiff believed he had other oral and written communications with Mr. Chong. Plaintiff described their first meeting as lasting two hours.

The precise substance of plaintiff's discussions with Mr. Chong is the subject of some dispute, but the particulars are not material to the disposition of this appeal. In broad terms, plaintiff contends that Mr. Chong solicited plaintiff's ideas because they would be helpful to Mr. Chong's work on Plan Project. Plan Project involved an investment planning tool, and plaintiff's ideas that he shared with Mr. Chong also involved an investment planning tool—one that was "automated" and "designed for young people early in their careers." As plaintiff conceived of his plan, it "had a number of components that could be operated manually or passed on computerized decision making." Plaintiff testified that he also shared with Mr. Chong two questionnaires for use in assessing client needs, one prepared by a third party and one that plaintiff personally helped to prepare.

At no point during these discussions with Mr. Chong or other Acorns representatives did plaintiff ever request payment for his ideas or ask that Acorns treat them as confidential or proprietary to plaintiff. But he did repeatedly inquire about potential opportunities for him to work with the company in the future.

After meeting with Mr. Chong in August 2018, plaintiff wrote to him: "I hope to eventually join the team in some helpful capacity." Less than a week later, he e-mailed Mr. Kerner to inquire about "[a]ny new developments" and expressed the desire to "help more directly." In October 2018, in response to an e-mail from Mr. Chong thanking him for sending a list of questions for a client questionnaire, plaintiff wrote "[i]f it so happens that you develop this part of the business, what role would you see for [me]?" Mr. Chong put the question back to plaintiff, to which

plaintiff responded that he saw himself "ensuring [Acorns] ha[s] a relevant and applicable planning tool (evolving project) and developing strategies to grow the business." Two months later, Mr. Chong wrote to plaintiff that Acorns was "looking for potential roles to expand the team in 2019" and invited plaintiff to Acorns's Irvine offices "for an extended discussion." Plaintiff again expressed interest but was unavailable on Mr. Chong's proposed date because he would be on his honeymoon.

After plaintiff returned from his honeymoon, he saw an Acorns investor presentation on Plan Project. In his view, the plan "basically adopted [his] key suggestions." His initial reaction was "pride." However, on further reflection, plaintiff felt that Acorns had "sought and obviously used [his] ideas and efforts, which seemed likely to make [Acorns] significant profits, but apparently [Acorns] w[as] deliberately avoiding the issue of compensation [for] using all the basic elements of [his] plan." Plaintiff considered this "very unfair," and it was "that realization" that led him to make a claim against Acorns and eventually sue Acorns in October 2019.

Plaintiff's complaint contains just two causes of action. The first is for breach of implied contract. The second is for declaratory relief to establish the parties' "rights and obligations with respect to the ideas presented to Acorns by plaintiff"—in effect, for a declaration of the terms of the alleged contract between plaintiff and Acorns. Plaintiff claimed damages of at least $10 million.

Following extensive discovery, Acorns moved for summary judgment. In support of its motion, it offered evidence that plaintiff could not establish any of the elements of breach of contract. As to the existence of a contract, Acorns offered

evidence that plaintiff offered his ideas to Acorns not for sale but for the purpose of securing an employment or other business relationship with Acorns. As to breach and damages, Acorns offered evidence that it never used plaintiff's ideas at all.

Plaintiff opposed the motion. His opposition relied predominantly on a declaration that, in some respects, recast the facts plaintiff had testified to in deposition. For example, in deposition, plaintiff testified that he felt he was acting as a consultant to Acorns "[i]n some capacity" beginning with his initial 2016 lunch with Messrs. Kerner, Keegan, and Field. In his declaration in support of his opposition, plaintiff testified that "[he] did not believe that [he] was acting as a consultant at this lunch. Later, that became [his] goal."

The trial court determined that Acorns's evidence was sufficient to shift the burden to plaintiff to show a triable issue. After considering plaintiff's evidence, the court concluded plaintiff failed to satisfy his burden. It found no evidence of a contract, because there was no evidence plaintiff expected compensation at the time of alleged formation; nor any breach of the contract alleged, because there was no evidence Acorns used plaintiff's ideas.

The trial court therefore granted Acorns's motion and plaintiff appealed.

## DISCUSSION

### 1. Summary Judgment Standard of Review

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) Summary judgment is appropriate where "all the papers submitted show

6

that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.,* subd. (c).)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.) It is no longer called a "disfavored" remedy. (*Ibid.*) "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid.*)

On appeal, "we take the facts from the record that was before the trial court . . . . [Citation.] ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

## 2. The Trial Court Properly Granted Summary Judgment

We agree with the trial court that there is no triable issue of fact as to the existence of a contract. Plaintiff failed to produce any evidence that he reasonably expected compensation for his ideas at the time he offered them. Because there was no contract, we need not consider whether there is a triable issue as to whether Acorns used plaintiff's ideas in breach of the alleged contract. Nor need we separately consider plaintiff's request for a declaration of rights because there is no contract nor any contractual rights to declare.

"A contract is either express or implied." (Civ. Code, § 1619.) "An express contract is one, the terms of which are

7

stated in words" (§ 1620); and "[a]n implied contract is one, the existence and terms of which are manifested by conduct" (§ 1621).

"The essential elements of a claim of breach of contract, whether express or implied, are the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and the resulting damages to the plaintiff." (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 433.)

Plaintiff has not shown he had an implied contract with Acorns. He states only that he need *not* show he made an express request for payment because a "plaintiff['s] reasonabl[e] belie[f] he would be compensated if his ideas were used" will excuse such a showing. He then argues that such a belief can be inferred from the facts and circumstances reflected in the record.

Relying on *Faris v. Enberg* (1979) 97 Cal.App.3d 309 (*Faris*), Acorns asserts plaintiff must show that he "prepared the work; that he . . . disclosed the work to [Acorns] for sale; [that] under all circumstances attending disclosure it can be concluded that [Acorns] voluntarily accepted the disclosure knowing the conditions on which it was tendered (i.e., [Acorns] [had] the opportunity to reject the attempted disclosure if the conditions were unacceptable); and the reasonable value of the work." (*Id.* at p. 318.) *Faris* concerned a concept for a television show and derived its analysis from the Supreme Court's decision in *Desny v. Wilder* (1956) 46 Cal.2d 715, which involved a film concept.

Plaintiff does not dispute that he must make the showing Acorns says *Faris* requires to establish an implied contract. Indeed, he relies primarily on *Gunther-Wahl* (2002) 104 Cal.App.4th 27, 42-43 (*Gunther-Wahl*), which concerned a

8

concept for a toy but borrowed from the *Desny v. Wilder* analysis used in *Faris*; and he argues that, although many implied contract cases involve disputes over movie or television ideas, their analysis is more broadly applicable. Because it appears to be undisputed, we accept for the purposes of our analysis that the *Faris* analysis applies here.

Plaintiff contends he showed a reasonable expectation of payment, even though he never asked for payment, because he disclosed his ideas to Acorns for sale. But there is no basis for a finding that plaintiff offered his ideas to Acorns for sale without evidence that he either had a reasonable expectation of payment or asked for payment. (See *Faris*, *supra*, 97 Cal.App.3d at p. 318 [finding no offer to sell in the absence of "evidence that plaintiff expected, or indicated his expectation of receiving compensation for the service of revealing the [television show concept]"].)

Plaintiff concedes that he never requested payment for his ideas until after he had shared them and discovered Acorns's alleged use of the ideas. He argues only that he "expected reasonable compensation if his ideas were used . . . ." But the record citations he offers to support his purported expectation of payment fail to establish it.

Three of the citations are to his separate statement in opposition to Acorns's summary judgment motion. The separate statement is not evidence; it only refers to evidence in the record. (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178, fn. 4.) In any event, nothing in the cited portions of the separate statement reflects that plaintiff expected payment in exchange for his ideas. The other two citations are to plaintiff's declaration in support of his opposition. Here too, there is no claim that plaintiff expected payment when he offered his ideas to Acorns.

9

Indeed, the only cited testimony that references compensation at all describes an epiphany plaintiff had long after he shared his ideas with Acorns and after he learned Acorns was allegedly using them. After feeling "pride" that Acorns had "adopted [his] key suggestions," plaintiff states he "began to realize that [Acorns] had sought and obviously used [his] ideas and efforts, which seemed likely to make [Acorns] significant profits, but apparently [Acorns] w[as] deliberately avoiding the issue of compensation."

Without evidence to establish he had *any* expectation of compensation when he shared his ideas, plaintiff is not entitled to have a jury consider whether he had a *reasonable* expectation of compensation.

In this regard, plaintiff's case is unlike the three cases he relies on to show a fact issue, *Gunther-Wahl, supra,* 104 Cal.App.4th 27; *Minniear v. Tors* (1968) 266 Cal.App.2d 495; and *Chandler v. Roach* (1957) 156 Cal.App.2d 435. In each of the three cases, the plaintiffs had developed ideas for the purposes of selling them and shared them with the defendants in the belief that they might purchase the ideas. In *Gunther-Wahl*, the plaintiff believed, at the time he shared his ideas with toy manufacturer Mattel, "that if Mattel liked the properties, they would enter negotiations to license and participate." (*Gunther-Wahl*, at p. 30.) In *Minniear*, the plaintiff shared his concept of a television series that he had developed "*for sale to TV*" with a television producer at a private screening. (*Minniear*, at pp. 497, 498, italics added.) And in *Chandler*, the plaintiff developed a television show concept, engaged an agent to market it for sale, and the agent shared the idea with a television producer. (*Chandler*, at p. 437.) In short, each of these plaintiffs

10

was engaged in sales activities by which he expected to be paid for his ideas. With the predicate expectation satisfied, a fact question existed as to whether the expectation was reasonable under the circumstances.

Not only does the record fail to establish plaintiff offered Acorns his ideas for sale with the expectation of payment; it establishes that he had a different objective: to sell his future services. Plaintiff initially hoped to get a job at Acorns. Mr. Patricof arranged for plaintiff to meet with Mr. Kerner after plaintiff inquired with Mr. Patricof about "possible opportunities in finance." Mr. Kerner referred to the possibility of plaintiff working for Acorns at their 2016 lunch meeting. When Mr. Kerner did not follow up with plaintiff, plaintiff was "disappoint[ed]." When the opportunity to interview for a job at Acorns came up later, plaintiff jumped at it, explaining that "the timing couldn't be better" and calling the job opening "a great opportunity."

Plaintiff attests that his interest at some point shifted from wanting "full-time employment" to becoming a consultant to Acorns. But the distinction does not matter for our purposes. Plaintiff points to no evidence that he disclosed his ideas to Acorns in the belief that he was selling *them*. All the evidence is that he was selling *himself*. After exploring employment opportunities, he had a "*goal*" of becoming a consultant, whereby he "*would* provide ideas that furthered [Acorns's] planning for a reasonable fee." (Italics added.) This does not amount to a present expectation of payment for ideas at the time they were offered.

As *Faris*, *supra*, 97 Cal.App.3d 309, reflects, one who offers an idea for purposes other than sale cannot later recover for the

11

value of those ideas under an implied contract theory.  In *Faris*, the plaintiff described his idea for a television game show to someone he thought would be a suitable host.  "Plaintiff never intended to submit the property for sale and did not tell [the prospective host] that he was submitting it for sale.  There [wa]s no reason to think that [the prospective host], or anyone else with whom [the prospective host] spoke, would have believed that Faris' submission was an offer to sell something, which if used would oblige the user to pay." (*Id.* at p. 319.)  This defeated Faris's implied contract claim.  (*Ibid.*)

The same can be said of plaintiff's disclosures to Acorns. Plaintiff offers no evidence that he intended to sell his ideas. Thus, there is no basis on which Acorns could be charged with an understanding that he was selling them and no basis on which to imply a contract for the sale of his ideas.

## DISPOSITION

The judgment is affirmed.  Acorns is to recover its costs on appeal.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.



WILEY, J.


12